Exhibit B

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| MORIELLO, Rebecca | ) | Disciplinary Case No. 2021-0007 |
| | ) | |
| Respondent | ) | |
| | ) | |

**ON BEHALF OF RESPONDENT**
Cyrus D. Mehta, Esq.
Cyrus D. Mehta & Partners PLLC
One Battery Park Plaza, 9th Floor
New York, New York 10004

**ON BEHALF OF THE GOVERNMENT**
Paul A. Rodrigues, Esq.
OGC/EOIR
5107 Leesburg Pike, Suite 2600
Falls Church, VA 22041

Catherine M. O'Connell, Esq.
USCIS/DHS
11411 East Jefferson Ave
Detroit, Michigan 48214

**CHARGES:** 8 C.F.R. § 1003.102(n): Engages in conduct that is prejudicial to the administration of justice or undermines the integrity of the adjudicative process. Conduct that will generally be subject to sanctions under this ground includes any action or inaction that seriously impairs or interferes with the adjudicative process when the practitioner should have reasonably known to avoid such conduct

8 C.F.R. § 1003.102: It is deemed to be in the public interest for an adjudicating official or the Board to impose disciplinary sanctions against any practitioner who falls within one or more of the categories enumerated in this section, but these categories do not constitute the exclusive grounds for which disciplinary sanctions may be imposed in the public interest. To wit: unprofessional, disrespectful, and disruptive conduct toward the Court and its personnel, in violation of Chapter 4.12(c) of the Immigration Court Practice Manual

**DECISION AND ORDER IN DISCIPLARY PROCEEDINGS**

1

## I. PROCEDURAL HISTORY

On January 14, 2021, Disciplinary Counsel for the Executive Office for Immigration Review ("EOIR") and the Disciplinary Counsel for the Department of Homeland Security ("DHS")(consolidated as "Government") jointly filed a Notice of Intent to Discipline ("NID") against the Respondent, Rebecca Moriello, seeking to disbar her[1] from practicing law before EOIR on the basis that her two convictions for administrative violations qualified as serious crimes. Exh. 1. The Disciplinary Counsel simultaneously filed a Joint Petition for Immediate Suspension, with evidence of the Respondent's convictions. Exh. 1A. The Respondent filed an answer to the NID on March 12, 2021. Exh. 2. On March 31, 2021, the Disciplinary Counsel acknowledged that the Respondent's conduct did not warrant the charge under the original NID and filed a motion to amend the NID, as well as to withdraw the Joint Petition for Immediate Suspension. Exh. 3. The amended NID requests that Respondent be suspended from the practice of law for thirty days for professional misconduct. Exh. 4. The Respondent consented to the withdrawal of the Joint Petition for Immediate Suspension, but opposed the motion to amend the NID and sought dismissal of the proceedings. Exh. 5. On June 30, 2021 the Board granted both the Motion to Withdraw the Joint Petition for Immediate Suspension and the Motion to Amend the NID. Exh. 6. The Respondent filed an answer to the amended NID on August 19, 2021. Exh. 7. On October 8, 2021, the Board of Immigration Appeals ("Board") ordered that the Respondent's case be referred to an adjudicating official ("Court") for factual findings and legal determinations. Exh. 8.

The Respondent waived her right to a hearing following the referral of this matter to the undersigned, the adjudicating official. The Government filed its evidence on December 16, 2021. Exh 9. The Respondent filed her evidence on December 17, 2021. Exh. 10. On January 18, 2022, the Government filed its brief with the Court and on March 21, 2022, the Respondent filed her brief. Exhs. 11 & 12. All evidence submitted by the parties has been reviewed, even if not specifically discussed.

## II. EXHIBIT LIST

**Exhibit 1:** Notice of Intent to Discipline, filed January 14, 2021

**Exhibit 1A:** Joint Petition for Immediate Suspension, with Supporting Evidence, filed December 17, 2018

**Exhibit 2:** Respondent's Answer to Notice of Intent to Discipline, filed March 12, 2021

**Exhibit 3:** Government's Motion to Withdraw and Amend Notice of Intent to Discipline, filed March 31, 2012

---

[1] Respondent identifies as non-binary, but counsel for Respondent uses pronouns she/her in these proceedings. The Court will continue with that nomenclature for consistency.

| **Exhibit 4:** | Government's Amended Notice of Intent to Discipline, filed March 31, 2021 |
| --- | --- |
| **Exhibit 5:** | Respondent's Opposition to Motion to Withdraw and Amend Notice of Intent to Discipline, filed April 12, 2021 |
| **Exhibit 6:** | Board of Immigration Appeals Decision, dated June 30, 2021 |
| **Exhibit 7:** | Respondent's Answer to Amended Notice of Intent to Discipline, filed August 19, 2021 |
| **Exhibit 8:** | Board of Immigration Appeals Decision Referring Case to Adjudicating Official, dated October 8, 2021 |
| **Exhibit 9:** | Government's Submission of Evidence, Tabs 1 – 7, filed December 16, 2021 |
| **Exhibit 10:** | Respondent's Submission of Evidence, Tabs A – J, filed December 17, 2021 |
| **Exhibit 11:** | Government's Brief, filed January 18, 2022 |
| **Exhibit 12:** | Respondent's Brief, filed March 21, 2022 |

### III. SUMMARY OF ALLEGED CONDUCT AND ARGUMENTS

The Amended NID charges the Respondent with Professional Misconduct based on the Respondent's actions during a removal hearing before Judge Pettinato of the Charlotte Immigration Court. Exh. 4. On June 29, 2017, Respondent appeared for a hearing before Judge Pettinato, and afterwards remained in the courtroom, with permission from the Respondent, to observe an asylum hearing as a spectator. *Id.* After the hearing began, Protective Services Officer ("PSO") Pinar Bridges ("PSO Bridges") observed Respondent typing on her cellphone and asked her to turn off the phone. *Id.* Respondent refused claiming to have the right to use her phone for business purposes. *Id.* Judge Pettinato also observed Respondent typing on her phone, found it distracting, and briefly went off the record to ask PSO Bridges to tell the Respondent to turn off her phone. *Id.*; *see also* Exh. 11. PSO Bridges approached the Respondent again, but the Respondent again refused to turn off her phone. Exh. 4. PSO Bridges then called a second PSO for assistance, but the Respondent continued to disregard their directions. *Id.* PSO Bridges called the Charlotte-Mecklenburg Police Department ("CMPD") for assistance. Judge Pettinato then called for a recess as a result of the escalating situation in the courtroom. *Id.*

In the presence of the CMPD officers, PSO Bridges again ordered the Respondent to turn off her phone and asked her to leave the courtroom. *Id.* When the Respondent again refused, the CMPD officers escorted her from the courtroom while the Respondent argued she had the right to use her phone for business purposes and could not be told what to do by Judge Pettinato. *Id.* A

3

Federal Protective Services agent issued Respondent a citation for failing to comply with the lawful direction of an authorized individual while on property under the authority of the Government Services Administration ("GSA"), a violation of 41 C.F.R. § 102-72.385. *Id.* A superseding bill of information added an additional charge of exhibiting disorderly conduct or other conduct that impedes and disrupts the performance of official duties by government employees while on GSA property, a violation under 41 C.F.R. § 102-72.390(c). *Id.*

On July 17, 2018, Magistrate Judge David C. Keesler of the United States District Court for the Western District of North Carolina found Respondent guilty on both charges. *Id.* Respondent was ordered to pay a $2,500 fine and a $10 assessment. The convictions were affirmed on appeal by the U.S. District Judge Martin Reidinger of the United States District Court for the Western District of North Carolina. Respondent appealed to the Fourth Circuit Court of Appeals, which also affirmed the conviction and sentence. *Id.* A petition for certiorari was denied by the United States Supreme Court. On February 15, 2021, the Grievance Committee of the North Carolina State Bar concluded that Respondent's refusal to comply with the order to cease using her cellphone was "prejudicial to the administration of justice" and issued a public censure. Exh. 10, Tab 7.

Based on the June 29, 2017, incident, the Government now asks this Adjudicating Official to find that Respondent engaged in conduct that was prejudicial to the administration of justice or undermined the integrity of the adjudicative process, a disciplinary violation under 8 C.F.R. § 1003.102(n). Exh. 4.

Respondent does not dispute the factual allegations. Exh. 12. She believed she was acting in good faith when she followed signage posted outside the courtroom stating that attorneys were exempt from the prohibition on using cellphones inside of the courtroom if used for business purposes; she routinely saw other attorneys using their cellphones. *Id.* She also attributes her refusal to follow the orders of court officers to her belief that Judge Pettinato would have personally chastised her if he wanted her to stop using her phone. Finally, she claimed that her condition of autism led her to conclude that she interpreted the cell phone rule correctly and that the officers informing her to turn off her phone were wrong. *Id.*

The Respondent disputes that her conduct seriously impaired or interfered with the adjudicative process. *Id.* Though she may have been perceived as disruptive by the immigration judge, she was quietly using her phone as permitted by the rules and as done by many other attorneys without issue. The Respondent further opposes being suspended from practice for any period of time as vindictive and excessive punishment for a minor offense that did not involve criminal activity.

## IV. <u>TESTIMONIAL SUMMARY</u>

The sole testimony in these proceedings was rendered during the Respondent's bench trial before Magistrate Judge Keesler of the Federal District Court for the Western District of North Carolina on July 12, 2018.[2] *See* Exh. 9, Tab 4.

---

[2] The Court has not included a summary of the testimony of FPS Special Agent Frank Skrtic, whose testimony solely concerned the legal authority of PSOs and policies applicable to cellphone use in the Charlotte Immigration Court.

4

### A. Testimony of PSO Pinar Bridges

On June 29, 2017, PSO Bridges was assigned to serve as bailiff to Judge Pettinato. As bailiff her duties included maintaining security in the courtroom, handling disturbances, and passing papers between lawyers, litigants, and judges. She wore her uniform, badge, and credentials when serving as bailiff.

An asylum hearing was scheduled for June 29, 2017. The hearings are confidential pursuant to regulation to protect the identity of asylum applicants. Respondent requested and received permission from the Court and, importantly, from the asylum applicant, to remain as an observer in the courtroom. PSO Bridges was standing near the judge at the front of the courtroom. She first noticed the Respondent sitting in the gallery of the courtroom with her head down. When she saw that the Respondent was on her phone, PSO Bridges told her she could not use her phone in the courtroom and needed to turn it off. She knew EOIR policy permitted attorneys to use their phones for business purposes but did not believe the Respondent was using the phone for business purposes since she was not the attorney of record in this case, but an observer. The Respondent told PSO Bridges that she had the right to use her phone and did not comply with PSO Bridge's request.

When PSO Bridges returned to her post next to Judge Pettinato, the judge paused the hearing and went off the record to tell PSO Bridges to tell the Respondent to turn off her phone. PSO Bridges immediately went to the Respondent to tell her that the judge was telling her to get off her phone. The Respondent answered that it was her right, she was using the phone for business purposes only, and she was not going to turn it off. PSO Bridges and the Respondent then went outside the courtroom, where PSO Bridges tried to explain to the Respondent that she could not use her phone and that the order came from the judge. The Respondent answered that she could do whatever she wanted, she was a lawyer, and she was using her phone for business purposes only. The Respondent then returned to the courtroom. PSO Bridges called her supervisor, who advised her to call the Charlotte-Mecklenburg Police Department ("CMPD").

Judge Pettinato called a recess when the CMPD arrived. At the request of the CMPD officers, PSO Bridges asked the Respondent one last time to turn off her phone and leave the courtroom. The Respondent answered that she was not doing anything wrong. The CMPD then told the Respondent that it was time to leave. Outside the courtroom, PSO Bridges overheard the Respondent telling the CMPD officers that the judge could not tell her what to do and that she had the right to be on the phone for business purposes.

The incident impacted the PSO officers because another officer had to replace PSO Bridges as bailiff when she stepped out of the courtroom to call for assistance. However, the other PSO officers were acting as bailiffs in other courtrooms or handling screening at the entrance and could not assist. As a result, the asylum hearing stopped. Overall, the incident with the Respondent involved herself, another PSO officer who had to leave their other duties to handle the incident, two CMPD officers, and two FPS officers who came to write the citation.

PSO Bridges did not include the Respondent's statements to the officers in her written incident notes because it was only an incident log, rather than a detailed report. However, she told Judge Pettinato about the comments that same day.

PSO Bridges could not see specifically what the Respondent was doing on her phone, only that she was typing. She could not recall the Respondent offering to show that she was only using her phone for business purposes. She initially approached the Respondent because she saw no reason the Respondent would be on her phone during the hearing when it was not her case and she had an office in the building where she could carry out business. She believed business purposes meant using the phone for work related to the case being heard. PSO Bridges does not allow people to use cellphones in courtrooms even when the hearing is not an asylum application. The officers screening at the entry tells everyone to turn off their cellphones, and if the attorney needs to use their phone for business purposes during a hearing, they are supposed to ask the judge for permission. PSO Bridges would also tell government attorneys to stop using their phones if she saw them using phones for non-business purposes.

### B. Testimony of Immigration Judge Barry Pettinato

Judge Pettinato has worked as an immigration judge for nine years. Asylum hearings are confidential, so the first question Judge Pettinato asked at the start of the hearing was why the Respondent was present and whether the litigant had consented. The attorney of record obtained his client's consent to the Respondent's presence in the courtroom and explained that she was there to observe the hearing and see what she could learn.

At the start of the hearing Judge Pettinato was busy with preliminary matters, but as the hearing commenced, he noticed the Respondent holding her phone at chest level and typing. During a pause in the hearing Judge Pettinato waved PSO Bridges up to the bench, turned off the Digital Audio Recording ("DAR"), and asked PSO Bridges to ask the Respondent to put away her phone and stop texting. He wanted the Respondent to stop using her phone because he found it distracting that she was glued to her cellphone despite asking for and receiving permission to observe a confidential hearing. The Respondent was using her phone quietly, but Judge Pettinato found it visually distracting as he was conducting the hearing. The Respondent was the only person in the gallery, she was holding her phone up at chest level, and he found it both distracting and disrespectful.

Judge Pettinato observed the interaction between PSO Bridges and the Respondent and found it to be visually distracting. It was clear that PSO Bridges was not making progress in convincing the Respondent to turn off her phone. The incident lasted five or ten minutes. At some point the Respondent moved to sit in the back of the courtroom while PSO Bridges continued to engage her. PSO Bridges then left the courtroom and returned with a second PSO. Judge Pettinato saw both of the officers standing by Respondent before PSO Bridges left the room again. At that point Judge Pettinato adjourned the case and took a recess because he could see that the situation had escalated. When he left the bench the Court Administrator informed him that the CMPD had been called, and he thereafter stayed out of the courtroom.

Judge Pettinato considered addressing the Respondent directly, but he had thought the situation would be resolved quickly and trusted PSO Bridges to handle the situation. In hindsight he believes he should have gone off the record and addressed the Respondent directly, but he felt at the time that he should stay out of the matter once he transferred it to the security officers.

Judge Pettinato views his relationship with the Respondent as a professional relationship. He views her as a difficult person to deal with in court because she is argumentative and disrespectful with judges. She becomes very argumentative after he issues rulings and she sometimes asks him sarcastic rhetorical questions. He had no recollection of pulling the Respondent aside to tell her a case was frivolous but would not be surprised if he had told her that they were spending a lot of time on a case that did not appear very meritorious. He did not direct the officers to issue a citation against the Respondent, but he did tell the U.S Attorney's Office that he thought they should proceed with the case.

### C. Testimony of Kofi Bentsi-Enchill

Mr. Bentsi-Enchill was the attorney whose case was being heard at the time of the incident with the Respondent. He was focused on the hearing and not fully aware of what was happening behind him, but he heard the security guard make a comment addressing the Respondent. He thought the comment might have concerned her recording the hearing. The judge then stopped the hearing.

### D. Testimony of Maureen Abell

Ms. Abell is an attorney with the Charlotte Center for Legal Advocacy, a non-profit for which the Respondent volunteers. She knows the Respondent to be an honest person. Ms. Abell represents clients in the Charlotte Immigration Court and regularly uses her phone and Kindle in the courtroom without issue. She has never seen a judge tell an attorney to not use their phone.

### E. Testimony of Joann Gaughan

Ms. Gaughan knows the Respondent because they are both immigration attorneys. She knows the Respondent to be an extremely honest person. Ms. Gaughan regularly uses her phone while in court and sees other attorneys do so as well. They are told to turn off their phones when they are going through security, but she never saw a judge tell anyone to turn off their phone. She once overheard a female security guard tell another guard that "no one likes that attorney anyway," in reference to Judge Pettinato denying a bond motion filed by the Respondent.

### F. Testimony of the Respondent

The Respondent began practicing immigration law in September of 2011. She exclusively practices removal defense, predominantly cancellation of removal. She also volunteers in the *pro bono* room at least once a month.

On June 29, 2017, she was in the cafeteria of the federal building when she saw Mr. Bentsi-Enchill. She did not know him personally but introduced herself and asked to observe his individual hearing, as she tries to obverse as many hearings as possible.

7

The Respondent was on her phone while observing because she believed she was permitted to do so since she was using her phone for business purposes. She was responding to emails relating to her pending cases. The sign in the lobby concerning cellphone usage clearly allowed her to use her cellphone for business purposes, and she could see no other plausible interpretation of the sign.

PSO Bridges approached the Respondent two or three times to tell her to turn off her phone. The Respondent explained to PSO Bridges that she was allowed to use her phone. PSO Bridges eventually told her, "well the judge told me to tell you," but the Respondent did not believe that actually happened. She thought PSO Bridges was lying about Judge Pettinato's involvement because she was annoyed the Respondent wasn't listening to her; she did not know PSO Bridges, but had seen PSOs lie before. Judge Pettinato usually had no qualms saying anything to individuals in the gallery, and she had never seen him pass a message through a security guard.

The Respondent thereafter moved to the right-hand side of the room to be less conspicuous because she wanted to mind her own business. Shortly thereafter the CMPD entered and escorted her out of the room. She kept asking them why and telling them she was allowed to use her phone, but they would not explain what was happening. Instead, they told her she was barred from the floor for twenty-four hours. At that point Respondent complied and decided to take the matter to the EOIR liaison.

An officer with a bullet proof vest and a dog later came to her office and questioned her on what had happened. He told her that everything would go away if she could show him the sign saying attorneys could use their phones in court for business purposes. When the officer returned, he informed her that he had been informed to write the citation.

The Respondent's relationship with Judge Pettinato is professional, but he is hostile towards her, her cases, and her clients. He tells her to stop bringing weak cases to court because he does not think that her client's hardship claims are sufficiently serious. One time she asked her client about her child's health for the purposes of hardship, and while her client was answering Judge Pettinato became furious and said "I have told you repeatedly that this is not hardship." He also frequently interrupts hearings to yell at her. On the worst occasion he stopped a hearing and brought her into the hallway behind the chambers to lecture her for ten minutes for bringing him weak cases and presenting weak evidence.

Attorneys regularly use their electronic devices in court, both in the gallery and at the counsel table. She did not believe she saw Judge Pettinato ever tell anyone not to use their phone when they were using it silently; she only heard him say something when a phone went off in court.

The Respondent was not aware of a policy allowing judges the discretion to prohibit the business use of phones if they were disruptive to ongoing proceedings, but did not believe it applied because she was not being disruptive.

Upon Magistrate Judge Keesler finding her guilty of both administrative offenses, Respondent apologized for her actions. She never meant to upset Judge Pettinato and PSO Bridges, but only to do what she thought was right.

## V. ISSUES PRESENTED

The issues in this case are: (1) whether 8 C.F.R. C.F.R. § 1003.102(n) requires "serious" interference with the adjudicative process; (2) whether Respondent's conduct violated 8 C.F.R. § 1003.102(n); and (3) what sanctions are appropriate if a violation is found.

## VI. SUMMARY OF THE LAW AND LEGAL ANALYSIS

### A. Charges Pursuant to 8 C.F.R. § 1003.102(n)

The Respondent is charged with violating 8 C.F.R. § 1003.102(n) for engaging in conduct prejudicial to the administration of justice. For the following reasons, the Court will sustain this charge and finds that the Respondent's June 29, 2017 conduct violated this regulation.

The core facts of what occurred on June 29, 2017, are not in dispute. Both parties acknowledge that the Respondent was typing into her cellphone while observing an asylum hearing. A security officer asked her to turn off her phone, but the Respondent refused because she believed she was permitted to use her phone. The judge, upon noticing the Respondent on her phone, then asked the same security officer to tell the Respondent to turn off her phone. When the security officer made this request and explained that it came from the judge, Respondent again refused to comply because she did not believe the order came from the judge. As the security officer continued to speak with Respondent, the judge adjourned the case and took a recess in response to the situation. Respondent was thereafter escorted out of the courtroom by police officers from the CMPD. As a result of this conduct the Respondent was convicted of two misdemeanor offenses for failing to comply with official directives and impeding government officials from performing their duties. On February 15, 2021, the Grievance Committee of the North Carolina State Bar found that the Respondent's conduct in Immigration Judge Pettinato's courtroom was prejudicial to the administration of justice in violation of North Carolina Rule of Professional Conduct 8.4(d), and further found that the Respondent's misdemeanor convictions stemming from offense reflected adversely on her fitness as a lawyer, in violation of North Carolina Rule of Professional Conduct Rule 8.4(b). The North Carolina bar issued a public censure based on its determination of the violation of North Carolina's Rules of Professional Conduct.

For an attorney's actions to qualify as a conduct prejudicial to the administration of justice, the Government must demonstrate by clear and convincing evidence that (1) the lawyer's conduct was improper; (2) the conduct bore directly on the judicial process in an identifiable case; and (3) the conduct tainted the judicial process in more than a *de minimis* way; it must "potentially impact upon the process to a serious and adverse degree." *In re Hopkins*, 677 A.2d 55, 60–61 (D.C.1996). Though never formally adopted by EOIR as the standard by which alleged violations under 8 C.F.R. § 1003.102(n) would be judged, the standard set forth in *Hopkins* was held out by EOIR as establishing the parameters for a violation of § 1003.102(n) when the rule was proposed. *See* 73 Fed. Reg. 44178-01 (July 30, 2008) (proposed rule). The *Hopkins* standard is also consistent with

9

the American Bar Association's ("ABA") Model Rules of Professional Conduct, which both parties agree the EOIR's rules are based upon, and which also refers to conduct which causes "serious interference with the administration of justice." *See* Ann. Mod. Rules Prof. Cond. § 8.4, Cmnt. 2. Furthermore, it strikes the Court as highly unlikely that the express reference in § 1003.102(n) to conduct which "seriously impairs or interferes with the adjudicative process" is a limited example of conduct that might violate the statute, rather than a statutory requirement which prevents the rule from applying to *de minimis* conduct. As aptly argued by the Respondent, no sentence from a statute should be interpreted in a way which renders it "superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Accordingly, the Court finds that a serious interruption or impairment of the adjudicative process is required for the Respondent to be found in violation of § 1003.102(n) and will apply the standard set forth in *Hopkins*.

Turning to the first prong of the test set forth in *Hopkins*, the Court finds that the Respondent's conduct on June 29, 2017, was improper. The Respondent's focus on the fact that she was using her phone in a quiet and non-disruptive manner misses the true issue. It was not the use of the cellphone itself that led to the complaint filed against her, but the Respondent's repeated refusal to follow the orders of court staff when told to stop using her phone that led to an escalation of her behavior such that it necessitated interrupting the proceedings and calling the police. The confrontation which Respondent created forms the basis of her improper behavior, not the mere use of the cellphone. Respondent should reasonably have known to follow the orders of the PSO working as the bailiff in the courtroom that day, regardless of whether she believed the directions to be coming from the PSO or the judge. PSOs are not merely security guards, but extensions of the tribunal tasked with assignments necessary to the court's functioning, especially with regard to maintaining control over persons and conduct within a courtroom. Indeed, her subjective belief that the PSO was "lying" to her is an elaborate construct to justify conduct which is not justifiable. *See* Exh. 9, Tab 3 at 59. It should not be surprising, especially to an attorney, that failing to comply with a lawful order from a PSO is a federal offense. *See* Exh. 9, Tabs 2 & 3. As explained by the Supreme Court of Minnesota, "[c]ourt staff are integral to administering justice," and disrespect of the court staff is no different than disrespect of the tribunal. *In re Disciplinary Action against Torgerson*, 870 N.W.2d 602, 611 (Minn. 2015).

The Court further finds, pursuant to the second prong, that Respondent's improper conduct bore directly on the judicial process in an identifiable case. There is no dispute that the improper conduct occurred while the Respondent observed an asylum hearing in Immigration Judge Pettinato's courtroom in the Charlotte Immigration Court.

Finally, the Court finds that the Respondent's improper conduct on June 29, 2017, seriously interfered with the adjudicative process. Immigration Judge Pettinato testified that he found the confrontation between PSO Pinar and Respondent visually distracting during the hearing. Exh. 9, Ta 4 at 131. As the situation escalated, he found it sufficiently distracting to warrant calling a recess to temporarily adjourn the case. *Id.* at 134. Conduct resulting in the cessation of a hearing, even if only for a short period of time, is unquestionably conduct which seriously interferes with the adjudicative process. The waste of court resources, including time, is a serious issue. *See In re White*, 11 A.3d 1226, 1232 (D.C. 2011) (holding that attorney disruption and delay caused by motion to disqualify attorney, who should have known it was improper for her to take the case,

10

sufficiently burdensome as to seriously interfere with the adjudicative process); *In re Spikes*, 881 A.2d 1118, 1126 (D.C. 2005) (finding serious harm to the judicial process where attorney wasted court's time and resources with frivolous filing); *In re Abbott*, 925 A.2d 482, 486 (Del. 2007) (finding attorney warranted sanctions for interfering with the administration of justice by forcing the court to waste resources striking offensive and sarcastic portions of his written arguments). This is especially true with the immigration courts, where judicial time is valuable. It is not uncommon for cases to be delayed for years before they can be heard. Any improper action causing a delay in the case not only wastes the time of the court and the litigants, but risks harming those for whom a delay of their hearing means a potential loss of eligibility for relief as well as securing removal if sought by DHS. Delays like the one caused by the Respondent amount to serious interference with the adjudicative process. Judicial time in immigration court is a premium commodity.

The Court is not persuaded that the decision of the Grievance Committee of the North Carolina State Bar to subject Respondent to a censure, rather than suspension, demonstrates that the Respondent's conduct was not serious. As defined by the North Carolina Administrative Code, a censure is "a written form of discipline more serious than a reprimand issued in cases in which an attorney has violated one or more provisions of the Rules of Professional Conduct and *has caused significant harm or potential significant harm* to a client, the administration of justice, the profession, or a member of the public, but the misconduct does not require suspension of the attorney's license." 27 N.C. Admin. Code 1B.0103(5) (emphasis added). Contrary to Respondent's argument, the fact that she was censured, despite having no prior disciplinary record, is a strong indication that the Grievance Committee of the North Carolina State Bar saw her conduct as causing serious harm to the administration of justice. *See* Exh. 9, Tab 7. Nor is the Court persuaded that the Respondent's conduct is not serious merely because others have faced more severe sanctions for their conduct in violation of the same section of the North Carolina Rules of Professional Conduct. That others have received worse punishments only demonstrates that their conduct was viewed as worse than the Respondent's, not that the Respondent's conduct was not serious.

Based on the above, the Court sustains the complaint and finds that the Respondent in violation of 8 C.F.R. § 1003.102(n) for engaging in conduct prejudicial to the administration of justice.

### B. Imposition of Sanctions

The Government has proven by clear and convincing evidence that the Respondent violated 8 C.F.R. § 1003.102(n) based on her conduct on June 29, 2017. It is therefore in the public interest for the Court to impose the appropriate sanction for this violation. 8 C.F.R. § 1003.102. The Government asks for Respondent to be suspended from practice for thirty days. The Respondent argues that a suspension would be an unduly harsh punishment for her offense, and that if any sanction is warranted, she should be subjected to no more than a public censure.

The Court looks to both case law as well as the ABA Standards for Imposing Lawyer Sanctions ("ABA Standards") to determine the appropriate sanction. The Court must consider (1)

the duty violated; (2) the Respondent's mental state; (3) the potential or actual injury caused by the misconduct; and (4) the existence of aggravating or mitigating factors. ABA Standards § 3.0.

Pursuant to Section 9.22 of the ABA Standards, aggravating factors to be considered include: (1) prior disciplinary offenses; (2) dishonest or selfish motives; (3) a pattern of misconduct; (4) multiple offenses; (5) bad faith obstruction of the disciplinary proceeding; (6) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (7) refusal to acknowledge wrongful nature of conduct; (8) vulnerability of victim; (9) substantial experience in the practice of law; (10) indifference to making restitution; and (11) illegal conduct. Mitigating factors to consider pursuant to Section 9.32 of the ABA Standards include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical disability; (9) mental disability or chemical dependency under certain circumstances; (10) delay in disciplinary proceedings; (11) imposition of other penalties or sanctions; (l2) remorse;  and (13) remoteness of prior offenses.

The duty violated by Respondent is one for which Section 6.22 of the ABA Standards recommends that a suspension is warranted when "a lawyer knows that he or she is violating a court order or rule, and which causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding." In this case, the Respondent ignored the orders of both a judge and the PSO acting on behalf of the judge because she errantly believed that her right to use her phone in the courtroom was greater than the authority of the Court. That Respondent believed herself to be in the right does not negate the fact that she *knowingly* ignored repeated orders from the PSO and the judge, resulting in the interruption of the proceedings and her removal from the courtroom by police officers. As such, the Court considers the Government's request for a thirty-day suspension to be reasonable and turns to the Respondent's mitigating and aggravating factors.

There are multiple aggravating factors. First, the Respondent is an experienced attorney who should have known better than to ignore orders given to her by court staff. At the time of the incident, the Respondent had been practicing exclusively before the Immigrations Courts for six years. *See* Exh. 9, Tab 4 at 167. As such, it is difficult to comprehend how Respondent was unable to recognize the problem with her actions.  Indeed, a fresh graduate from law school would know that when a judge – or their staff – issues an order or directive, counsel is obligated to obey it. If counsel believes that the order is erroneous, counsel must know that other remedies are the proper course of action - an appeal or an inquiry to the court administrator, such as in this case, to determine the scope of the cellphone rule.  What *any* attorney knows, or should know, is that an attorney cannot unilaterally decide to contravene an order of the court whether from the judge's mouth or through their personnel. And that furthermore, to do so has consequences. Second, Respondent did not merely disobey a court order conveyed to her, she escalated the matter to the point where it caused a disturbance such that the Court recessed proceedings and police had to be summoned to resolve the situation.  Her obstinacy in the face of repeated requests to stop her behavior drained resources from the local police department as well as the immigration court - and all because Respondent unilaterally decided her interpretation of the signage on cellphone usage

12

was the correct one. Finally, Respondent continually insists she is being "punished" for using her cellphone in court. She is not. She is being subjected to first criminal and now disciplinary violations for failing to follow legitimate and proper orders of the Court and escalating her refusal such that police needed to be called. Her social media posts in which she places herself as a martyr for being prosecuted for improper cellphone usage misses the mark and deliberately mischaracterizes the issue. These postings thereby place the Court and its authority in an unfavorable light which is not supported by the facts. *See* Exh. 9, Tab 6.

Respondent's case also presents several mitigating factors. First, Respondent has no prior disciplinary record; this incident is the sole blemish on an otherwise clean record. Exh. 9, Tab 7. Second, she only engaged in misconduct on one occasion and has not since repeated the behavior. Third, there is no indication that her actions were motivated by dishonesty or selfishness. Fourth, she has a reputation as a hardworking and caring attorney who mentors other attorneys and performs substantial *pro bono* work. *See* Exh. 9, Tab 4 at 186-191; Exh. 10, Tabs G - J; Exh. 12, Tab A. Fifth, the Respondent has suffered other penalties as a result of her actions. She received a censure from the Grievance Committee of the North Carolina State Bar and now has a criminal record. *See* Exh. 9, Tabs 1 & 7.

The Respondent asks the Court to consider as a mitigating factor the fact that she has an antagonistic relationship with Immigration Judge Pettinato and works in a jurisdiction with a low grant rate for asylum cases. While the Court does not doubt the sincerity of the Respondent's subjective belief that she was being singled out by Judge Pettinato and PSO Bridges for personal reasons, the Court does not find the nature of the relationship with the Court to be supported by objective facts and finds no foundation for the accusation that she was targeted for personal reasons. It is purely her subjective belief and therefore is not a mitigating factor. Respondent chose to work in this jurisdiction, which she terms as one with a "low grant rate." *See* Exh. 12. This is no doubt difficult for one representing Respondents. But as a professional working in this jurisdiction, the Respondent needs to be able to handle cases without reacting adversely to basic orders from court staff. This is especially true when those orders have no direct impact on her case, as she was a visitor observing in the courtroom on June 29, 2017. The Respondent having an emotional reaction to a PSO telling her to put her cellphone away while the Respondent is a guest in the courtroom observing a case is not justifiable. She was not caught in the emotion of standing next to a client being ordered removed or objecting to difficult evidence against one's client. As such, the Court will not accord any weight to this factor.

Respondent also asks the Court to recognize her autism diagnosis as a mitigating factor, explaining that her autism impelled her to argue with the court staff when she believed herself to be right and them to be wrong. The ABA standards set forth the circumstances under which mental health problems may be considered as mitigating factors as when (1) there is medical evidence of the mental disability; (2) the mental disability caused the misconduct; (3) the respondent's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) recurrence of the misconduct is unlikely as a result of recovery. ABA Standards 9.32(g). Respondent presents proof of her autism diagnosis and its relationship to her misconduct through a report from a therapist. Exh. 10, Tab A. However, Respondent fails to present evidence that she is taking steps to prevent her autism from causing her to engage in misconduct again. Though she recognizes in hindsight that her autism played a role in her

unwillingness to listen to the orders given by PSO Bridges, she has not made efforts to prevent similar events from happening in the future, such as evidence of therapy where she could learn tools to help her manage her autistic condition. This Court recognizes that factors beyond Respondent's control may have influenced her improper conduct, but the Court cannot consider them a mitigating factor because Respondent has failed to take any steps that her autism will not cause future misconduct. Rather, the Court finds the fact that the Respondent has not taken any further actions to learn how to cope with her disability to be a negative factor. For a litigant to claim that they cannot control their actions because of a disability, but then do nothing more about the issue beyond stating that they will not misbehave again, is problematic.

In consideration of the circumstances of the Respondent's misconduct, and after weighing the aggravating and mitigating factors, the Court finds that a short suspension from the practice of law before EOIR and DHS is warranted. Her refusal to comply with orders from court staff, and unsupported assumption that PSO Bridges was lying to her when told the order came directly from the judge, was egregious. As an experienced attorney, the Respondent should have known better than to believe that she had the right to overrule the orders and requests of court staff and to rely on her own interpretation of the cellphone rule. As noted previously, if she disagreed, she had avenues to lodge that disagreement. Use of proper avenues is fundamental to basic lawyering. She was not at liberty to decide that she was correct and disobey legitimate orders of the court and to escalate that belief to disruption of proceedings necessitating the presence of police officers.

The Court acknowledges that this sanction is stronger than the sanction issued against Respondent by the North Carolina State Bar. However, this Court's jurisdiction is separate and distinct, and this Court is not bound by the state bar's decision. *See Matter of P. Singh*, 26 I. & N. Dec. 623, 625 (BIA 2015) (discussing how sanctions attorney could potentially receive from the state bar were not relevant to his EOIR sanctions). Furthermore, the Court does not know whether North Carolina's Grievance Committee had any familiarity with the workings of the Immigration Courts, or how a delay to a case could cause significant and far-reaching consequences. Had the Grievance Committee been aware of the consequences delays can have on litigants appearing before this nation's immigration courts, they may have felt stronger sanctions to be warranted. Finally, the North Carolina State Bar is primarily concerned with behavior in its courts, and, rightfully, deferred to EOIR to assess the impact of professional violations within EOIR's purview.

The Court also understands that the Respondent is anxious that a suspension could cause her to lose clients because they will view the suspension as a sign that she is disfavored by the Courts. However, the potential loss of clients to an attorney is not a significant factor to be considered in weighing sanctions for misconduct. *See, e.g. Matter of Salomon*, 25 I. & N. Dec. 559, 562 (BIA 2011), citing *Matter of Kronegold*, 25 I&N Dec. 157, 162 (BIA 2010) ("hardship and the difficulties attendant to disbarment do not equate to injustice.") Furthermore, there is nothing stopping Respondent from fully explaining to her clients the basis for the sanction in order to assuage their concerns.

The last question before the Court is how long of a suspension is warranted given the Respondent's conduct and the attendant circumstances. In the amended NID, the Government requests that the Respondent be suspended for thirty days. Exh. 4. According to the Section 2.3 of the ABA Standards, a suspension should generally be no shorter than six months and no longer

14

than three years. However, it is not uncommon for shorter suspensions to be ordered. *See Matter of Member of Bar Gelof*, 142 A.3d 506 (Del. 2016) (ordering thirty day suspension); *KY Bar Ass'n v. Hensley*, 538 S.W.3d 288, 289 (KY 2018); *Matter of Bagley*, 477 S.E.2d 834 (GA 1996). Furthermore, the Court does not believe a suspension as long as six months is warranted. The Respondent does not have a prior disciplinary record, and this single incident appears to be an anomaly in an otherwise exemplary record. Furthermore, the Respondent represents a population in need of skilled legal representation. A suspension of thirty days, the minimum amount of time requested by the Government is reasonable and should suffice to remind Respondent that misconduct before the Immigration Courts has consequences, while also having an only limited impact on her ability to represent her clients.

Therefore, after considering the facts of the case and the Respondent's mitigating factors, the Court believes that it is in the public interest to suspend her from practicing before the Immigration Courts, BIA, and DHS for thirty days.

Accordingly the following order shall enter:

## **ORDER**

It is hereby **ORDERED** that the Respondent be **SUSPENDED** for thirty (30) days.

Date: May 5, 2022

_____
Steven A. Morley
Immigration Judge
Adjudicating Official